**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1904**

MIGUEL ANGEL AREVALO QUINTERO,

Petitioner,

v.

MERRICK B. GARLAND,  Attorney General,

Respondent.

--------------------------------

RETIRED IMMIGRATION JUDGES AND FORMER MEMBERS OF THE
BOARD OF IMMIGRATION APPEALS,

Amicus Supporting Petitioner.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued:  December 8, 2020                          Decided:  May 26, 2021

Before MOTZ, WYNN, and FLOYD, Circuit Judges.

Petition for review granted and remand awarded by published opinion.  Judge Wynn wrote the opinion, in which Judge Floyd joined.  Judge Motz wrote an opinion concurring in the judgment.

**ARGUED:** Susan Baker Manning, MORGAN LEWIS & BOCKIUS, LLP, Washington, D.C., for Petitioner. Jenny Chong Lee, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Patrick A. Harvey, Clara Kollm, MORGAN, LEWIS & BOCKIUS LLP, Washington, D.C., for Petitioner. Joseph H. Hunt, Assistant Attorney General, Jonathan Robbins, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. Steven H. Schulman, AKIN GUMP STRAUSS HAUER & FELD LLP, Washington, D.C., for Amici Retired IJs and Former Members of the Board of Immigration Appeals.

WYNN, Circuit Judge:

Petitioner Miguel Angel Arevalo Quintero seeks review of the Board of Immigration Appeals' final order affirming the denial of his application for asylum, withholding of removal, and protection under the Convention Against Torture. His petition alleges that the immigration judge and the Board of Immigration Appeals made several legal errors in their consideration of his claims for withholding of removal and Convention Against Torture relief.[1] This case also presents an important question of first impression in our Circuit: whether immigration judges have a legal duty to develop the record.

For the reasons set forth below, we hold that they do. Accordingly, we grant the petition for review, vacate the denial of Petitioner's application for withholding of removal and protection under the Convention Against Torture, and remand for further proceedings consistent with this opinion.

I.

A.

Petitioner was born in 1994 in El Salvador, a country long plagued by rampant gang violence and instability. Salvadoran gangs "exercise extraordinary levels of social control over the population . . . [,] principally through the use of threats and violence to create a

---

[1] Petitioner does not contest the agency's determination that his asylum application was time-barred. Thus, he has waived any arguments related to that determination on appeal. *See* Fed. R. App. P. 28(a)(8)(A); *Edwards v. City of Goldsboro*, 178 F.3d 231, 241 n.6 (4th Cir. 1999).

pervasive atmosphere of fear." A.R. 215.[2] These gangs actively recruit young men and boys in their territories, and those who resist recruitment are generally seen as challenging the gang's authority and often suffer violence or even death as a result.[3] The two major gangs in El Salvador are MS-13 and Barrio-18.[4]

In September 2012, Petitioner, then a teenager, joined MS-13.[5] Within a few months of joining MS-13, he realized he had made a mistake, as the gang made him collect extortion money and deliver drugs. Feeling that he "just couldn't take it anymore," Petitioner decided to leave the gang. A.R. 171.

But when Petitioner told the gang about his intent to leave, MS-13 members called him to an isolated place, beat him, and threatened to kill him. They told him that he could not leave the gang and warned that if he tried to do so, he would "get burned." A.R. 172. Shortly after this incident, Petitioner received a threatening phone call from a gang member who was in prison and who warned that Petitioner and his family would be in danger if he left the gang.

---

[2] Citations to "A.R. _" refer to the Administrative Record filed by the parties in this appeal.

[3] In 2015, El Salvador had the highest homicide rate in the world, with the vast majority of victims being men and boys between the ages of 15 and 34.

[4] Mara Salvatrucha, better known as MS-13, is a transnational criminal gang that was founded in Los Angeles in the 1980s by Salvadoran immigrants fleeing the civil war.

[5] The following account is generally based on Petitioner's testimony before the immigration judge. As explained below, we must assume his testimony to be credible for purposes of this appeal. *See infra*, Part II.

Fearing for his life, Petitioner continued to pick up extortion money for MS-13 from time to time, but he remained committed to leaving the gang. Realizing that leaving El Salvador was "the only way to flee from th[e] [gang]," A.R. 168, he left the country in June 2013 and arrived in the United States soon afterward.

But MS-13's threats continued. For example, gang members in El Salvador sent him a menacing Facebook message asking where he was and warning him, "we take some time, but we don't forget." A.R. 174. Due to the "death threats" he had received from MS-13—both in El Salvador and in the U.S.—Petitioner feared that the gang would murder him if he were to return to El Salvador. A.R. 168. And for good reason. In 2015, MS-13 members shot, dismembered, and beheaded Petitioner's cousin, José Ramiro, in front of Ramiro's mother and 11-year-old sister because Ramiro tried to leave the gang.

In the U.S., Petitioner supported himself by working construction jobs. But at some point in 2017, he became homeless. So when he met three young people who offered him shelter in a vacant apartment in Prince George's County, Maryland, he agreed to stay with them. Petitioner did not disclose his past involvement with MS-13 to his roommates because he was afraid of being located by the gang. And he wore long-sleeved shirts to cover his gang tattoos.

On July 24, 2017, Prince George's County police arrested Petitioner and the three other unauthorized occupants in the apartment. While searching Petitioner, the officers saw his gang tattoos and referred him to the county Gang Unit. Later that day, Immigration and Customs Enforcement officers took Petitioner into custody. He has remained in immigration detention ever since.

B.

On July 25, 2017, the Department of Homeland Security issued a Notice to Appear and initiated removal proceedings against Petitioner. Over the next few months, Petitioner appeared *pro se* at several master calendar hearings before an immigration judge, admitting removability and expressing his fear of returning to El Salvador. He also filed a handwritten, self-completed Form I-589 (Application for Asylum and for Withholding of Removal).

On his Form I-589, Petitioner indicated that he sought asylum and withholding of removal based on his membership in a particular social group, as well as protection under the Convention Against Torture. On the form, he described fearing return to El Salvador because he believed MS-13 would kill him for leaving the gang. He also noted that the gang had already killed his cousin for the same reason and that MS-13 would kill anyone who deserted it.

On December 13, 2017, Petitioner appeared *pro se* before an immigration judge for an individual hearing on his I-589 application. In his testimony, he expressed fear that MS-13 would kill him for leaving the gang if he were to return to El Salvador. He recounted his brief involvement in the gang, the beating and death threats he had received upon communicating his desire to leave MS-13, his decision to flee to the U.S., and the menacing Facebook message he received from MS-13. Petitioner explained that MS-13 saw him as a deserter since he told them he wanted to leave and then fled El Salvador shortly afterward. He stated: "I'm [a] person that has left, fleeing them . . . [and] that's something that they don't allow." A.R. 184. Petitioner testified that the gang was "going to murder [him] if [he

6

went] back to El Salvador" because they had "already threatened" him along "with [his murdered] cousin." A.R. 175. He further stated: "[T]hey're always going to find me. They're always going to know me, and they're going to murder me because they don't forgive." A.R. 176. In support of his I-589 application, Petitioner also submitted extensive country-conditions evidence concerning gang violence in El Salvador.

On December 14, 2017, the immigration judge issued a written decision denying all of Petitioner's applications for relief. Notably, the immigration judge found Petitioner's testimony that he had left MS-13 and was no longer part of the gang to be not credible and stated that the "adverse credibility determination . . . necessarily call[ed] into question all aspects of [his] claim." A.R. 136. The immigration judge further explained that she found no reliable evidence in the record supporting Petitioner's eligibility for asylum or withholding of removal. But the immigration judge's decision contained no discussion of any particular social groups, other than a passing observation in a footnote that "[e]ven if some of [Petitioner's] testimony were taken as credible," being "threatened while still a gang member for indicating he wanted to leave . . . would not constitute a statutorily protected ground." *Id.*

The immigration judge also denied Convention Against Torture relief, concluding that Petitioner had failed to demonstrate that he would more likely than not be tortured in El Salvador "with the consent or acquiescence of the government." *Id.* Accordingly, the immigration judge ordered that Petitioner be removed to El Salvador.

Petitioner appealed the immigration judge's decision to the Board of Immigration Appeals, again proceeding *pro se*. In an unpublished, nonprecedential opinion, the Board

of Immigration Appeals affirmed the immigration judge's decision. Petitioner then sought this Court's review. The Government moved to remand the case so that the Board of Immigration Appeals could consider the impact, if any, of its intervening decision in *Matter of W-Y-C- & H-O-B-*, 27 I. & N. Dec. 189 (BIA 2018). We granted the motion to remand.

On remand, the Board of Immigration Appeals again affirmed the immigration judge's denial of all requested relief and dismissed Petitioner's appeal in an unpublished, nonprecedential decision. The Board of Immigration Appeals also denied Petitioner's motion to remand the case to the immigration judge. Petitioner timely appealed to this Court and filed an emergency motion for stay of removal. We granted the motion and stayed his removal pending disposition of the present petition.

II.

This Court has jurisdiction to review "final orders of removal." 8 U.S.C. § 1252(a)(1). "Where, as here, [the Board of Immigration Appeals'] decision has adopted and supplemented an [immigration judge's] decision, we are obliged to review both rulings." *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011). We review factual findings under the substantial evidence standard, treating them as "conclusive unless the evidence was such that any reasonable adjudicator would have been compelled to a contrary view." *Id.* We review legal conclusions *de novo*. *Orellana v. Barr*, 925 F.3d 145, 151 (4th Cir. 2019). Here, because the Board of Immigration Appeals' decision subject to our review

8

was an unpublished, nonprecedential opinion, it is not entitled to *Chevron* deference[6]—although we may accord it *Skidmore* deference.[7] *See Amos v. Lynch*, 790 F.3d 512, 518 (4th Cir. 2015); *Martinez*, 740 F.3d at 909–10. Ultimately, we must affirm the Board of Immigration Appeals' decision unless it is "manifestly contrary to the law and an abuse of discretion." *Tassi*, 660 F.3d at 719; *see also* 8 U.S.C. § 1252(b)(4)(D).

"These standards demand deference, but they do not render our review toothless." *Orellana*, 925 F.3d at 151. The Board of Immigration Appeals abuses its discretion if it "fail[s] to offer a reasoned explanation for its decision, or if it distort[s] or disregard[s] important aspects of the applicant's claim." *Tassi*, 660 F.3d at 719.

Also importantly, although the immigration judge found parts of Petitioner's testimony to be not credible, we must assume that he testified credibly because both of the Board of Immigration Appeals' decisions below assumed so without ever addressing the issue. This Court may only reach issues decided by the Board of Immigration Appeals because issues unaddressed by the Board are not part of the final order of removal and thus

---

[6] We generally give deference to the Board of Immigration Appeals' interpretations of the Immigration and Nationality Act, "recognizing that Congress conferred on the [Board] decisionmaking power to decide such questions of law." *Martinez v. Holder*, 740 F.3d 902, 909 (4th Cir.), *as revised* (Jan. 27, 2014); *see also Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).

[7] Even where *Chevron* deference does not apply, we may rely on an agency's opinions as a "body of experience and informed judgment to which" we may "properly resort for guidance." *A.T. Massey Coal Co. v. Holland*, 472 F.3d 148, 168–69 (4th Cir. 2006) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). "But even that modest deference depends upon 'the thoroughness evident in [the Board of Immigration Appeals'] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'" *Martinez*, 740 F.3d at 910 (alteration modified) (quoting *A.T. Massey Coal*, 472 F.3d at 168–69).

fall outside the scope of our jurisdiction. *Amaya v. Rosen*, 986 F.3d 424, 429 (4th Cir. 2021); *see also* 8 U.S.C. § 1252(a)(1) (limiting federal court jurisdiction to final orders of removal).

Accordingly, where the Board of Immigration Appeals does not expressly affirm, adopt, or reject an immigration judge's credibility ruling, we lack jurisdiction to review it. In such situations, we have assumed the petitioner to be credible in reviewing the questions presented to us. *See, e.g.*, *Lin v. Mukasey*, 517 F.3d 685, 687–88 (4th Cir. 2008). This practice is consistent with the approach of our sister circuits. *E.g.*, *Margos v. Gonzales*, 443 F.3d 593, 597 (7th Cir. 2006); *Chen v. Gonzales*, 417 F.3d 268, 271 (2d Cir. 2005); *Krotova v. Gonzales*, 416 F.3d 1080, 1084 (9th Cir. 2005); *Kayembe v. Ashcroft*, 334 F.3d 231, 234–35 (3d Cir. 2003). Thus, for purposes of the present petition, we will assume, without deciding, that Petitioner's account—i.e., that he is a former MS-13 member who fled El Salvador to leave and escape the gang—is credible.

III.

Petitioner first argues that the immigration judge and the Board of Immigration Appeals erred in denying his application for withholding of removal. Specifically, he contends that the immigration judge had a duty to fully develop the record as to two particular social groups plainly supported by his factual allegations—former MS-13 members in El Salvador who left the gang without permission and family members of José Ramiro (his murdered cousin)—and that the immigration judge reversibly erred in failing to fulfill that duty or to analyze those groups in evaluating his application for withholding of removal. Petitioner further claims that the Board of Immigration Appeals erred in (1)

10

relying on *Matter of W-Y-C-* to bar consideration of the two particular social groups mentioned above and (2) mischaracterizing his claim and analyzing a group that he never put forward—*current* MS-13 members who are threatened for wanting to leave the gang.

As explained below, we hold that immigration judges have a legal duty to develop the record, which takes on particular importance in *pro se* cases, and that the immigration judge in this case erred in failing to discharge that duty. We also conclude that the Board of Immigration Appeals erred in refusing to consider Petitioner's proposed particular social groups based on *Matter of W-Y-C-* and in mischaracterizing his claim.

A.

As an initial matter, we consider whether immigration judges have any duty to develop the record in immigration court proceedings. In keeping with the unanimous view among our sister circuits, we conclude that immigration judges do have such a duty.[8] This

---

[8] While our sister circuits agree that immigration judges have a duty to develop the record in at least some contexts, their views diverge as to whether such a duty applies in all cases. Some circuits have deemed this duty to be generally applicable in all immigration court proceedings. *See, e.g.*, *Islam v. Gonzales*, 469 F.3d 53, 55 (2d Cir. 2006); *Hasanaj v. Ashcroft*, 385 F.3d 780, 783 (7th Cir. 2004). Others have recognized it only in cases involving *pro se* respondents, although none of those courts have expressly foreclosed the possibility of a general duty. *See, e.g.*, *Al Khouri v. Ashcroft*, 362 F.3d 461, 464–65 (8th Cir. 2004); *Jacinto v. INS*, 208 F.3d 725, 734 (9th Cir. 2000). Then there are some circuits that have not specified whether the duty applies generally or only in the *pro se* context. *See, e.g.*, *Mekhoukh v. Ashcroft*, 358 F.3d 118, 129–30 & n.14 (1st Cir. 2004); *Toure v. Att'y Gen. of U.S.*, 443 F.3d 310, 325 (3d Cir. 2006). As we explain below in greater detail, we are persuaded that immigration judges have a general duty to develop the record in *all* cases before them, and that this duty is especially important in *pro se* cases. In recognizing the general duty, we deem it appropriate to rely on cases from all of the other circuits, because they draw support from legal bases that are applicable regardless of whether or not a respondent is represented.

obligation is rooted first and foremost in the text of the Immigration and Nationality Act, but also finds support in our jurisprudence concerning Social Security disability hearings and in international refugee law.

Although the Fourth Circuit has not yet recognized in a published decision immigration judges' duty to develop the record, we have done so in unpublished opinions,[9] which puts us in line with every circuit to have considered the issue as well as the Board of Immigration Appeals. *See, e.g.*, *Agyeman v. INS*, 296 F.3d 871, 877, 883–84 (9th Cir. 2002); *Mendoza-Garcia v. Barr*, 918 F.3d 498, 504–05 (6th Cir. 2019); *Al Khouri v. Ashcroft*, 362 F.3d 461, 464–65 (8th Cir. 2004); *United States v. Copeland*, 376 F.3d 61, 71 (2d Cir. 2004); *Hasanaj v. Ashcroft*, 385 F.3d 780, 783 (7th Cir. 2004); *Mekhoukh v. Ashcroft*, 358 F.3d 118, 129–30 & n.14 (1st Cir. 2004); *Toure v. Att'y Gen. of U.S.*, 443 F.3d 310, 325 (3d Cir. 2006); *Matter of S-M-J-*, 21 I. & N. Dec. 722, 723–24, 729 (BIA 1997); *Matter of E-F-H-L-*, 26 I. & N. Dec. 319, 323–24 (BIA 2014), *vacated on other grounds*, 27 I. & N. Dec. 226 (A.G. 2018); *see also Solis Romero v. Barr*, 769 F. App'x 126, 127 (5th Cir. 2019); *Zheng v. Holder*, 507 F. App'x 755, 762 (10th Cir. 2013).

In recognizing such a duty, courts of appeals and the Board of Immigration Appeals have relied on several sources of authority. First, they have grounded the duty principally in a provision of the Immigration and Nationality Act which commands immigration

---

[9] *See Chen v. Holder*, 531 F. App'x 364, 370 n.7 (4th Cir. 2013) (acknowledging that "an [immigration judge] has a role in the development of the record"); *Mohammed v. Holder*, 424 F. App'x 215, 216 (4th Cir. 2011) (suggesting that immigration judges have an obligation to "aid in the development of the record" in *pro se* cases (quoting *Matter of J-F-F-*, 23 I. & N. Dec. 912, 922 (A.G. 2006))).

judges to "administer oaths, receive evidence, and interrogate, examine, and cross-examine the [noncitizen] and any witnesses" in removal proceedings. 8 U.S.C. § 1229a(b)(1). Based on this statutory requirement, our sister circuits have held that "unlike an Article III judge," an immigration judge "is not merely the fact finder and adjudicator but also has an obligation to establish the record." *Yang v. McElroy*, 277 F.3d 158, 162 (2d Cir. 2002) (citing § 1229a(b)(1)); *see also Lacsina Pangilinan v. Holder*, 568 F.3d 708, 709 (9th Cir. 2009) (stating that the immigration judge's "obligation [to develop the record] is founded on his statutory duty" under § 1229a(b)(1)); *Hasanaj*, 385 F.3d at 783 (citing § 1229a(b)(1) and *Yang*, 277 F.3d at 162); *Constanza-Martinez v. Holder*, 739 F.3d 1100, 1102–03 (8th Cir. 2014) (same); *Mekhoukh*, 358 F.3d at 129–30 n.14 (same). The Board of Immigration Appeals and the Attorney General have likewise grounded immigration judges' "duty to fully develop the record" in § 1229a(b)(1). *Matter of E-F-H-L-*, 26 I. & N. Dec. at 323–24 (citing § 1229a(b)(1)); *see also Matter of J-F-F-*, 23 I. & N. Dec. at 922 (same).

Second, our sister circuits have held that immigration judges' duty to develop the record is an essential requirement of a full and fair hearing to which noncitizens in removal proceedings are entitled under the Due Process Clause of the Fifth Amendment.[10] *See, e.g.*, *Agyeman*, 296 F.3d at 877; *Al Khouri*, 362 F.3d at 464–65; *Mendoza-Garcia*, 918 F.3d at 504; *see also Mekhoukh*, 358 F.3d at 129–30 (considering whether the petitioner's "hearing was fundamentally unfair because the immigration judge failed to fully develop the

---

[10] "It is well established that the Fifth Amendment entitles [noncitizens] to due process of law in deportation proceedings." *Reno v. Flores*, 507 U.S. 292, 306 (1993).

record"); *In Re: Compre-Tavares*, No. AXX XX4 184 - FLOR, 2008 WL 2782951, at *1 (BIA June 20, 2008) (concluding that a noncitizen "did not receive a full and fair hearing" because he was prejudiced by the immigration judge's failure to "develop a complete record"). Specifically, the Ninth Circuit has explained that noncitizens in removal proceedings are entitled to certain procedural protections provided by statute or regulation—including those provided in § 1229a(b)(1)—and that a prejudicial denial of any of those protections violates "the constitutional guarantee of due process."[11] *Jacinto v. INS*, 208 F.3d 725, 727–28 (9th Cir. 2000).

Third, the earliest and most influential circuit-court decisions establishing immigration judges' duty to develop the record also relied on an analogy to the Social Security disability context, where administrative law judges have a similar obligation. In *Jacinto v. INS*, the Ninth Circuit observed that "[b]oth administrative settings have the

---

[11] Although our holding today grounds immigration judges' duty to develop the record in 8 U.S.C. § 1229a(b)(1), rather than due process, cases from our sister circuits that rely on due process are no less relevant here. First, most of those circuits also recognize 8 U.S.C. § 1229a(b)(1) as a main source of the duty. *See, e.g.*, *Lacsina Pangilinan*, 568 F.3d at 709; *Constanza-Martinez*, 739 F.3d at 1102–03; *Mekhoukh*, 358 F.3d at 129–30 n.14. Second, we have explained that the purpose of the procedural protections provided in the Immigration and Nationality Act and related regulations—such as those set forth in 8 U.S.C. § 1229a(b)(1)—"is to ensure that a [noncitizen respondent] receives a meaningful hearing" in accordance with the requirements of procedural due process. *Rusu v. INS*, 296 F.3d 316, 321 n.7 (4th Cir. 2002). Thus, following the Ninth Circuit's lead, *Rusu* held that a denial of such a statutory protection also deprives a noncitizen of "a full and fair hearing consistent with due process." *Id.* (citing *Jacinto*, 208 F.3d at 727–28). Given this inextricable connection between due process and the statutory protections provided in the Act—i.e., the common telos of ensuring a full and fair hearing for every noncitizen—we deem it both appropriate and necessary to draw guidance from persuasive authorities relying on due process.

14

common feature of determining the applicant's eligibility for certain benefits," and that "both social security and deportation hearings are likely to be unfamiliar settings for the applicant." 208 F.3d at 733. Hence, the court reasoned that "the duty of the immigration judge is analogous to that of the administrative law judge in social security disability cases[, who] . . . has a duty to 'fully and fairly develop the record.'" *Id.* (quoting *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983)).

Subsequently, in *Yang v. McElroy*, the Second Circuit likewise established immigration judges' duty to develop the record, drawing support from the Social Security context. *See* 277 F.3d at 162–63 & n.3 (emphasizing that the court had "consistently" held that a Social Security administrative law judge "ha[d] an affirmative obligation to develop [the] administrative record"); *see also id.* at 163 n.3 (citing the Ninth Circuit's analogy in *Jacinto*). The *Yang* court also relied on the Supreme Court's directive in *Richardson v. Perales* that an administrative law judge must "act[] as an examiner charged with developing the facts," suggesting that the same is true for immigration judges. *Id.* at 162 (quoting 402 U.S. 389, 410 (1971)). More recently, the Sixth Circuit similarly analogized the duty imposed on immigration judges to administrative law judges' duty to "develop the record in the context of social security hearings." *Mendoza-Garcia*, 918 F.3d at 504–05. And other circuits, while not explicitly drawing analogies between the immigration and Social Security contexts, have relied on *Jacinto*, *Yang*, and *Richardson* in recognizing immigration judges' duty to develop the record. *See, e.g.*, *Mekhoukh*, 358 F.3d at 129–30 n.14; *Hasanaj*, 385 F.3d at 783; *Al Khouri*, 362 F.3d at 464–65.

15

In cases involving noncitizens seeking asylum or withholding of removal under 8 U.S.C. § 1231(b)(3), the Board of Immigration Appeals and federal courts have also invoked the United States' treaty obligations under the United Nations Convention Relating to the Status of Refugees ("Refugee Convention") as a source of immigration judges' duty to fully develop the record. In *Matter of S-M-J-*, the Board of Immigration Appeals set forth the duties of immigration adjudicators in evaluating applications for asylum and withholding of removal. *See* 21 I. & N. Dec. 722 (BIA 1997). The Board of Immigration Appeals first discussed the Refugee Convention, the U.S.'s obligations thereunder, and Congress's intent to incorporate those obligations into domestic law via the Refugee Act of 1980. *Id.* at 723. It then stated:

> Although we recognize that the burden of proof in asylum and withholding of deportation cases is on the applicant, *we do have certain obligations under international law to extend refuge to those who qualify for such relief . . . .* Because this Board, the Immigration Judges, and the Immigration and Naturalization Service are all bound to uphold [the Refugee Act], *we all bear the responsibility of ensuring that refugee protection is provided where such protection is warranted by the circumstances of an asylum applicant's claim*.

*Id.* (emphases added). Thus, the Board of Immigration Appeals explained, "a cooperative approach in Immigration Court is particularly appropriate," and immigration judges "have a role in introducing [relevant] evidence into the record." *Id.* at 723–24, 726. Drawing substantial guidance from the Office of the United Nations High Commissioner for Refugees' Handbook on Procedures and Criteria for Determining Refugee Status, the Board of Immigration Appeals held that "*the duty to ascertain and evaluate all the relevant facts is shared between the applicant and the examiner*," and that the adjudicator must "[e]nsure that the applicant presents his case as fully as possible and with all available

evidence." *Id.* at 729 (emphasis added) (alteration in original) (quoting Off. of the United Nations High Comm'r for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees, UN doc HCR/IP/4/Eng/Rev.3*, paras. 196, 205 (1979, reissued 2019) ("United Nations Handbook")).[12]

According to the Board of Immigration Appeals' pronouncements in *S-M-J-*, immigration adjudicators have an affirmative duty to assist and work with applicants to ensure that asylum or withholding of removal is granted to those who qualify for such protection based on their individual circumstances. And as relevant here, that obligation encompasses the shared "duty to ascertain and evaluate all the relevant facts." *Id.* (quoting United Nations Handbook, para. 196). Notably, the Second and Ninth Circuits too have relied substantially upon the same portions of the United Nations Handbook in recognizing immigration judges' duty to fully develop the record. *See Yang*, 277 F.3d at 162; *Jacinto*,

---

[12] Paragraphs 66 and 67 of the United Nations Handbook, although not quoted in *S-M-J-*, further note: "Often the applicant himself may not be aware of the reasons for the persecution feared. *It is not, however, his duty to analyze his case to such an extent as to identify the reasons in detail*." United Nations Handbook, para. 66 (emphasis added). Rather, "*[i]t is for the examiner*, when investigating the facts of the case, *to ascertain the reason or reasons for the persecution feared and to decide whether the [refugee] definition . . . is met*." *Id.*, para. 67 (emphases added). Although the views of the Office of the United Nations High Commissioner for Refugees are not binding, federal courts, including this Court and the Supreme Court, have long relied on its Handbook as a valuable interpretive aid. *See, e.g.*, *INS v. Cardoza-Fonseca*, 480 U.S. 421, 438–39 & n.22 (1987) (noting that the "Handbook provides significant guidance" in construing asylum law); *M.A. A26851062 v. INS*, 858 F.2d 210, 214 (4th Cir. 1988) (same).

208 F.3d at 732–33 & n.5; *see also Mekhoukh*, 358 F.3d at 129–30 n.14 (1st Cir.) (quoting *Yang*'s reference to the United Nations Handbook).

Today, we join the broad consensus among our sister circuits by holding that immigration judges have a legal duty to fully develop the record in the cases that come before them. Like the Board of Immigration Appeals and the other circuits to have considered this issue, we are persuaded that such a duty necessarily arises from the dictates of 8 U.S.C. § 1229a(b)(1) and, where relevant, the United States' obligations under the Refugee Convention.[13] Additionally, the duty to develop the record finds further support in our Social Security disability jurisprudence, where we have long held that administrative law judges have a "duty to fully inquire into the issues necessary for adequate development of the record." *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980). Like our sister circuits, we deem the duties of immigration judges to be analogous to those of Social Security administrative law judges.[14]

---

[13] As 8 U.S.C. § 1229a(b)(1) provides a sufficient legal basis for recognizing this duty, we deem it unnecessary to engage in a separate due process analysis. But, as noted above, we have previously held that a denial of a statutory protection provided in the Immigration and Nationality Act also deprives the noncitizen of "a full and fair hearing consistent with due process." *See Rusu*, 296 F.3d at 321 n.7.

[14] To be sure, there are differences between Social Security disability hearings and removal proceedings. For instance, the former hearings, unlike removal hearings, are non-adversarial in nature. *See Pearson v. Colvin*, 810 F.3d 204, 210 (4th Cir. 2015). Yet the two contexts also share significant analogous elements. Both contexts involve civil proceedings before a federal agency in which an administrative adjudicator determines an applicant's eligibility for certain benefits. And in both contexts, making that determination requires a fact-intensive inquiry and the application of a complex body of law. Additionally, just as Social Security administrative law judges have a duty to "look[] fully into the issues," "question[] [the claimant] and the other witnesses," and "[a]ccept[] as

Despite the strong consensus on this matter, as noted, there is an important split among the numerous circuits to have recognized this duty: while some circuits have deemed immigration judges' duty to develop the record to be generally applicable regardless of whether the noncitizen is represented by counsel, others have recognized it only in the *pro se* context, albeit without expressly ruling out the possibility of a general duty. *See supra* note 8. We see no reason why this duty should not extend to all cases, and accordingly, we join the first group of our sister circuits in recognizing its broad applicability.

Notably, *neither* of the sources in which this obligation is rooted—the text of the Act and international refugee law—limits this procedural protection to uncounseled noncitizens. Specifically, we emphasize that 8 U.S.C. § 1229a(b)(1) governs *all* removal proceedings, not just *pro se* cases. Nor would the United States' obligations under the Refugee Convention, as interpreted by the Board of Immigration Appeals in *Matter of S-M-J-*, be any less enforceable in counseled cases.

Moreover, in the Social Security disability context, administrative law judges' "duty to fully and fairly develop the record . . . exists even when the claimant is represented by counsel." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983); *see also Marsh*, 632 F.2d

---

evidence any documents . . . material to the issues," 20 C.F.R. § 404.944, immigration judges have a similar obligation to "receive evidence[] and interrogate, examine, and cross-examine the [noncitizen] and any witnesses," 8 U.S.C. § 1229a(b)(1). And the fact that we have recognized and enforced Social Security administrative law judges' duty to develop the record for more than forty years demonstrates the practicability and value of recognizing a similar duty for immigration judges.

at 299 (4th Cir.); *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Given that we find the duty of immigration judges to be analogous to that of Social Security administrative law judges, we deem it appropriate not to limit immigration judges' obligation to *pro se* cases.

For these reasons, we hold that immigration judges are charged with a duty to fully develop the record in all cases before them.

## B.

That being said, we wholly agree with our sister circuits that, in light of the significant challenges *pro se* individuals in removal proceedings face, such individuals have a particularly strong need for procedural protections, without which they would not be able to "receive[] a meaningful hearing." *Rusu*, 296 F.3d at 321 n.7. Accordingly, we hold that immigration judges' duty to fully develop the record—while applicable in all cases—becomes especially crucial in cases involving unrepresented noncitizens.

Other circuits, the Attorney General, and the Board of Immigration Appeals alike have emphasized the importance of this duty in the *pro se* context, citing three main rationales: (1) the abstruse nature of immigration law;[15] (2) the substantial disadvantages faced by uncounseled noncitizens generally due to factors such as a lack of English proficiency and relevant legal knowledge; and (3) the gravity of the interests at stake—

---

[15] *See Castro-O'Ryan v. INS*, 847 F.2d 1307, 1312 (9th Cir. 1988) (observing that, "[w]ith only a small degree of hyperbole, the immigration laws have been termed 'second only to the Internal Revenue Code in complexity'"); *Drax v. Reno*, 338 F.3d 98, 99 (2d Cir. 2003) (noting the "labyrinthine character of modern immigration law").

especially for individuals seeking protection from persecution or torture. *See, e.g.*, *Jacinto*, 208 F.3d at 732–34; *Al Khouri*, 362 F.3d at 464–65; *Mendoza-Garcia*, 918 F.3d at 504–05; *Copeland*, 376 F.3d at 71; *Matter of J-F-F-*, 23 I. & N. Dec. at 922; *In Re: Compre-Tavares*, 2008 WL 2782951, at *1 (emphasizing the immigration judge's "responsibility to develop a complete record" in light of the *pro se* respondent's limited legal knowledge). Accordingly, courts have held that in cases involving *pro se* noncitizens, "it is critical that the [immigration judge] 'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'" *Agyeman*, 296 F.3d at 877 (quoting *Jacinto*, 208 F.3d at 733). "Otherwise, such [noncitizens] would have no way of knowing what information was relevant to their cases and would be practically foreclosed from making a case against removal." *Copeland*, 376 F.3d at 71.[16]

---

[16] Corroborating the truth of this observation, a study of 1.2 million removal cases decided between 2007 and 2012 shows that noncitizens with counsel were *5.5 times more likely* than those without to obtain relief, after controlling for other variables. *See* Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. Pa. L. Rev. 1, 57 (2015). Detained noncitizens with counsel were *10.5 times more likely* than their *pro se* counterparts to obtain a successful outcome (i.e., grant of relief or case termination), while never-detained individuals with counsel were *3.5 times more likely* to avoid removal than never-detained *pro se* respondents. *See id.* at 49; *see also* Robert A. Katzmann, *The Legal Profession and the Unmet Needs of the Immigrant Poor*, 21 Geo. J. Legal Ethics 3, 4 (2008) ("The importance of quality representation . . . is especially acute for immigrants, not only because the stakes are often so high . . . but also because there is a wide disparity in the success rate of those who have lawyers and those who proceed pro se."); Sabrineh Ardalan, *Access to Justice for Asylum Seekers: Developing an Effective Model of Holistic Asylum Representation*, 48 U. Mich. J. L. Reform 1001, 1003 & n.6 (2015) (discussing a 2010 study which found that *pro se* asylum seekers were *nearly 5 times less likely to obtain relief* than those with representation).

In light of these important considerations, we join two of our sister circuits in holding that immigration judges' duty to fully develop the record becomes particularly important in cases involving uncounseled noncitizens.[17] *See Delgado v. Mukasey*, 508 F.3d 702, 706 (2d Cir. 2007) (holding that immigration judges have "an affirmative obligation to help establish and develop the record . . . *especially when . . . [a noncitizen] is unrepresented by counsel*" (emphasis added) (internal quotation marks and citations omitted)); *Barragan-Ojeda v. Sessions*, 853 F.3d 374, 381 (7th Cir. 2017) (affirming that immigration judges have "an obligation to establish the record" and stressing that "*[p]articularly with a pro se respondent*[,] . . . fair questioning by the [immigration judge]" is required to obtain all information "necessary for a reasoned decision" (emphasis added) (quoting *Hasanaj*, 385 F.3d at 783)). As we have previously explained, "the purpose" of such statutory protections "is to ensure that [every noncitizen respondent] receives a meaningful[,] . . . full[,] and fair hearing." *Rusu*, 296 F.3d at 321 n.7. Given the sheer difficulty of "navigating an unfamiliar legal system [without counsel] while facing the daunting prospect of deportation," *pro se* individuals are deprived of adequate hearings

---

[17] This holding is also consistent with our precedent recognizing that immigration judges' duty to ensure that the noncitizen sufficiently understands their appeal rights becomes "especially important" in *pro se* cases, *Narine v. Holder*, 559 F.3d 246, 250–51 (4th Cir. 2009); that federal courts have an obligation to liberally construe *pro se* complaints, "however inartfully pleaded," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); and, in the Social Security context, that although Social Security administrative law judges have a duty to aid all claimants in developing the record, they have a "heightened responsibility" to "help[] [*pro se*] claimants" do so, *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980).

when they are thrown into removal proceedings and left to sink or swim without adequate assistance from the immigration judge. *Diop v. Lynch*, 807 F.3d 70, 76 (4th Cir. 2015).

C.

In the instant case, Petitioner appeared without counsel before the immigration judge. It is thus necessary for us to determine what immigration judges' duty to fully develop the record entails in *pro se* cases. In doing so, we draw guidance from the decisions of our sister circuits.

Courts have held—and we agree—that in *pro se* cases, immigration judges' duty to develop the record includes adequately explaining the hearing procedures and the relevant legal requirements in plain language. *See Jacinto*, 208 F.3d at 728, 734–35; *Copeland*, 376 F.3d at 71 ("Given that [immigration judges] have a duty to develop the administrative record, . . . our removal system relies on [them] to explain the law accurately to *pro se* [noncitizens]."). In particular, immigration judges must provide respondents with sufficient guidance as to how they may prove the elements of their claims—i.e., "what evidence will demonstrate their eligibility for relief from deportation" and "in what form that evidence could be presented." *Agyeman*, 296 F.3d at 883–84.

In doing so, immigration judges "must be responsive to the particular circumstances of [each] case, including what types of evidence the [noncitizen] can and cannot reasonably be expected to produce in support of his applications for relief from deportation." *Id.* at 884. "Sensitivity to what evidence the [noncitizen] can reasonably be expected to produce is especially critical" for detained respondents like Petitioner, as they "may have limited access to relevant documents and will, therefore, depend even more heavily on the

23

[immigration judge] for assistance in identifying appropriate sources of evidence to support [their] claim." *Id.* Additionally, we agree with our sister circuits that immigration judges have a duty to probe into, inquire of, and elicit all facts relevant to a respondent's claims, *see, e.g.*, *id.* at 877, 883–84; *Mendoza-Garcia*, 918 F.3d at 504; *Al Khouri*, 362 F.3d at 465, and that they "must be especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited," *Jacinto*, 208 F.3d at 733 (quoting *Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985)).

As indicated by persuasive authority from other circuits, immigration judges' duty requires more than just asking a specific number of relevant questions. For instance, in *Jacinto*, the Ninth Circuit held that the immigration judge's inadequate probing into the relationship between the asylum-seeking petitioner's political opinions and the feared harm had deprived the petitioner of a full and fair hearing, even though the immigration judge had actively questioned her throughout the hearing. *See* 208 F.3d at 731–32, 734–35. The court also found that the immigration judge had further erred in failing to ensure that the petitioner adequately understood the hearing procedures, the relevant legal requirements, and the questions presented to her. *See id.*

Similarly, in *Mendoza-Garcia*, the Sixth Circuit noted that even where an immigration judge "ask[s] relevant questions," "the superficial quality of the questioning" may nonetheless deprive a noncitizen of a full and fair hearing. 918 F.3d at 507 (quoting *Lashley v. Sec'y of Health & Hum. Servs.*, 708 F.2d 1048, 1053 (6th Cir. 1983)). In particular, the court deemed it potentially problematic that the immigration judge had "rarely asked for clarification and moved quickly from topic to topic" despite the fact that

24

"responses elicited" through "two layers of translation" were "unusually prone to error and confusion." *Id.*

Furthermore, other courts have held that immigration judges may not "circumscrib[e] [a respondent's] ability to elaborate on the details of his claim by instructing him only to answer the questions asked," *Al Khouri*, 362 F.3d at 465, or "correct [their] failure to probe more deeply by simply asking the [noncitizen] whether he has 'anything to add in support of his claim,'" *Lacsina Pangilinan*, 568 F.3d at 709 (quoting *Colmenar v. INS*, 210 F.3d 967, 972 (9th Cir. 2000)). As these cases demonstrate, the purpose of these procedural safeguards is to ensure that unrepresented noncitizens can meaningfully participate in their removal proceedings and advocate for themselves with reasonable competence—or, in other words, to ensure a full and fair hearing.

Importantly, we emphasize that the scope and substance of immigration judges' duty to develop the record in *pro se* cases are not limited to what we describe here. Moreover, because it is undisputed that Petitioner was a *pro se* respondent throughout the proceedings before the immigration judge and the Board of Immigration Appeals, we need not and do not explicitly delineate what this duty demands in cases involving counseled noncitizens, individuals who are represented for part of their proceedings, or those represented by incompetent counsel. That being said, we believe the various requirements described above may also apply equally in other types of cases—for instance, where a noncitizen is represented by ineffective counsel.

And while we outline these general principles to provide guidance to immigration judges in the Fourth Circuit as well as to the Board of Immigration Appeals, what the

25

aforesaid duty requires of an immigration judge inevitably depends on the particulars of each case—the respondent's characteristics, such as age, education level, detention status, and immigration history; the applicable ground(s) of removability; and the form(s) of relief sought. *Cf. Lashley*, 708 F.2d at 1052 ("There is no bright line test for determining when the administrative law judge has . . . failed to fully develop the record. The determination in each case must be made on a case by case basis."). Accordingly, we must now determine what this duty entailed in the specific context presented by this case.

D.

Petitioner argues that when a *pro se* respondent seeks asylum or withholding of removal based on his or her membership in a particular social group, the immigration judge has a duty to fully develop the record as to the factual bases for that claim and to help the respondent articulate a cognizable social group supported by those facts—to the extent that one can be found. We agree.

Under the Act, an applicant for asylum has the burden to show that he or she is (1) "unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, th[e] country [of removal]" (2) "because of persecution or a well-founded fear of persecution" (3) "on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(B). Similarly, a noncitizen seeking withholding of removal must show that his or her "life or

26

freedom would be threatened" in the country of removal on account of one of the same five protected grounds. *Id.* § 1231(b)(3)(A); 8 C.F.R. § 1208.16(b).[18]

Generally speaking, asylum eligibility and withholding-of-removal eligibility share mostly identical requirements: (1) the feared or threatened harm must rise to the level of "persecution" in severity; (2) the harm must be inflicted by "either a government or an entity that the government cannot or will not control"; and (3) a statutorily protected characteristic (i.e., race, religion, nationality, membership in a particular social group, or political opinion) of the applicant must be "at least one central reason" for the feared persecution. *Crespin-Valladares v. Holder*, 632 F.3d 117, 124–28 (4th Cir. 2011); *see also* 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(B), 1231(b)(3)(A); 8 C.F.R. §§ 1208.13(b), 1208.16(b). The key difference between asylum and withholding-of-removal eligibility is the requisite level of likelihood that the applicant would suffer persecution: whereas asylum applicants need only show a "reasonable possibility" of persecution (a mere ten-percent chance would suffice), *Crespin-Valladares*, 632 F.3d at 126 (quoting *Cardoza-Fonseca*, 480 U.S. at 440), withholding applicants must show that they would more likely

---

[18] Noncitizens may also seek withholding of removal under the Convention Against Torture. *See* 8 C.F.R. § 1208.16(c). To qualify for this form of relief, an applicant must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *Id.* Unlike asylum or withholding of removal under 8 U.S.C. § 1231(b)(3), Convention Against Torture relief does not require a "nexus" between the feared harm and one of the five enumerated grounds (race, religion, nationality, membership in a particular social group, or political opinion). In this opinion, we use the term "withholding of removal" to refer only to withholding under the Act (8 U.S.C. § 1231(b)(3)), since particular-social-group analysis—the key subject matter at issue here—is irrelevant to withholding of removal under the Convention Against Torture.

than not be persecuted (i.e., higher than a fifty-percent chance), *see* 8 C.F.R. § 1208.16(b). Establishing past persecution based on one of the protected grounds creates a rebuttable presumption of a well-founded fear of future persecution for asylum or a sufficient likelihood of future persecution for withholding of removal.[19] *See* 8 C.F.R. §§ 1208.13(b)(1), 1208.16(b)(1).

In light of these similarities, most noncitizens seeking refuge from persecution apply for both forms of relief. Accordingly, we use the term "asylum seeker" throughout this opinion to refer to any applicant for asylum or withholding of removal, or both.

There are weighty reasons to construe immigration judges' duty to develop the record broadly in cases involving *pro se* asylum seekers. First, as the Board of Immigration Appeals explained in *Matter of S-M-J-*, immigration judges (and the Board of Immigration Appeals) have an obligation under international law and the Refugee Act of 1980 to "ensur[e] that refugee protection is provided where such protection is warranted by the circumstances of an asylum applicant's claim." *Matter of S-M-J-*, 21 I. & N. Dec. at 723. Relying substantially on the United Nations Handbook, *S-M-J-* also emphasized the shared duty of immigration judges "to ascertain and evaluate all the relevant facts" and to "[e]nsure that the applicant presents his case as fully as possible and with all available evidence." *Id.* at 729 (alteration in original) (quoting United Nations Handbook, paras. 196, 205); *see also* United Nations Handbook, para. 67 (noting immigration adjudicators' duty

---

[19] Asylum and withholding of removal also have different bars to eligibility. *Compare* 8 U.S.C. § 1158(b)(2), *and* 8 C.F.R. § 1208.13(c), *with* 8 U.S.C. § 1231(b)(3)(B), *and* 8 C.F.R. § 1208.16(d)(2).

to "ascertain the reason or reasons for the persecution feared and to decide whether the [refugee] definition" is met). In other words, under both international and U.S. refugee law, immigration judges have an affirmative duty to work with asylum seekers to ensure that protection is granted to those whose *factual* circumstances warrant it—especially where the applicant has difficulty articulating the *legal* bases for his or her claim.[20]

Moreover, the rationales for holding that immigration judges' duty to develop the record becomes especially important in *pro se* cases generally—discussed above—apply with even greater force in *pro se* asylum or withholding-of-removal cases. While U.S. immigration law is generally notorious for its esoteric nature, the law of asylum is one of the more complex areas thereof. As relevant here, the law concerning particular social groups is "rife with ambiguities, inconsistent applications, and circuit splits." Br. of *Amici Curiae* Retired Immigration Judges & Former Members of the Board of Immigration Appeals ("Amicus Br.") at 12; *see also Fatin v. INS.*, 12 F.3d 1233, 1238 (3d Cir. 1993) ("Both courts and commentators have struggled to define 'particular social group.' Read in its broadest literal sense, the phrase is almost completely open-ended."). Under the

---

[20] Although *S-M-J-* concerned asylum and withholding of removal, the considerations discussed therein apply at least as forcefully in Convention Against Torture cases. While an individual who meets the refugee definition may still be denied asylum or withholding of removal based on factors such as certain criminal convictions, the prohibition on deporting a person to any country where he or she would more likely than not be subject to torture is absolute. *See Cole v. Holder*, 659 F.3d 762, 770 (9th Cir. 2011) ("[W]here torture is sufficiently likely, [Convention Against Torture relief] does not permit any discretion or provide for any exceptions." (internal quotation marks omitted)); *see also* 8 C.F.R. § 1208.17(a). That being said, we do not address the nature and scope of immigration judges' duty to develop the record with regard to Convention Against Torture claims, since Petitioner did not raise that issue here.

current framework, a noncitizen seeking asylum or withholding of removal based on membership in a particular social group must show that the proposed group is legally cognizable—i.e., "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 237 (BIA 2014); *see also Oliva v. Lynch*, 807 F.3d 53, 61 (4th Cir. 2015) (adopting *M-E-V-G-*'s three-part test).

While a particular social group's cognizability often makes or breaks an asylum or withholding claim, it is a highly technical legal issue, and "[e]ven experienced immigration attorneys have difficulty articulating the contours of a [cognizable social group]." *Cantarero-Lagos v. Barr*, 924 F.3d 145, 154 (5th Cir. 2019) (Dennis, J., concurring). Thus, we deem it unreasonable and fundamentally unfair to expect *pro se* asylum seekers—many of whom suffer from the effects of trauma and lack literacy, English proficiency, formal education, and relevant legal knowledge—to even understand what a particular social group is, let alone fully appreciate which facts may be relevant to their claims and articulate a legally cognizable group. *See Jacinto*, 208 F.3d at 733 (discussing the challenges faced by *pro se* asylum seekers); Amicus Br. at 9–10 (same).[21] And needless to say, these cases *per se* implicate extremely weighty interests in life and liberty, as they involve individuals

---

[21] *See also* Ardalan, *supra* note 16, at 1013–18 ("Obstacles like language barriers, past trauma, limited legal knowledge, and restricted access to basic social services often impede asylum seekers from effectively telling their stories. These obstacles may also prevent asylum applicants from gathering the evidence necessary to carry their burden of proof. Many asylum seekers flee their home countries with little other than the clothes on their backs, so they may not have much proof to substantiate their asylum claims.").

seeking protection from persecution, torture, or even death. *See Xue v. Bd. of Immigr. Appeals*, 439 F.3d 111, 113–14 (2d Cir. 2006) ("We should not forget, after all, what is at stake. For each time we wrongly deny a meritorious asylum [or withholding] application, . . . we risk condemning an individual to persecution. Whether the danger is of religious discrimination, extrajudicial punishment, forced abortion or involuntary sterilization, physical torture or banishment, we must always remember the toll that is paid if and when we err.").

For these reasons, immigration judges, the Board of Immigration Appeals, and courts of appeals have long assisted *pro se* asylum seekers with articulating a cognizable particular social group. *See* Amicus Br. at 13–15; *see also, e.g.*, *Cece v. Holder*, 733 F.3d 662, 670–71 (7th Cir. 2013); *Paloka v. Holder*, 762 F.3d 191, 198–99 (2d Cir. 2014); *de Abarca v. Holder*, 757 F.3d 334, 336 (1st Cir. 2014); *Matter of S-V-C-*, AXXX XXX 431 (BIA Nov. 1, 2016). Indeed, the amici former immigration judges and members of the Board of Immigration Appeals explain that it has been a decades-long "common practice among Immigration Judges [to] enter[] into a dialogue with respondents to identify claims for relief, including defining a legally sufficient particular social group."[22] Amicus Br. at 1. The amici further emphasize that when they worked in the immigration system, they

---

[22] The Government too acknowledges that "[w]hen an applicant claims to fear persecution on account of a particular social group but fails to name the group, the immigration judges routinely analyze the case on the facts" and may "infer" a particular social group. Resp. Br. at 51 (citing *Mayorga-Rosa v. Sessions*, 888 F.3d 379, 382 (8th Cir. 2018), as an example).

generally did not expect *pro se* applicants to even attempt to present particular social groups.

All of these important considerations compel us to hold that immigration judges have a broad and robust duty to help *pro se* asylum seekers articulate their particular social groups. As the Ninth Circuit aptly observed in *Jacinto*, "a full exploration of all the facts is critical to correctly determine whether [an asylum seeker] does indeed face persecution in their homeland." 208 F.3d at 733; *see also id.* ("[Upon removal, an asylum seeker] could face a significant threat to his or her life, safety, and well-being. Should the immigration judge fail to fully develop the record, information crucial to [the applicant's] future [would] remain[] undisclosed."). We further agree with our sister circuit that in these cases "the immigration judge is in a good position to draw out those facts that are relevant to the final determination." *Id.*

Thus, with regard to particular social groups, we conclude that immigration judges must, at a minimum, adequately explain in plain language: what a particular social group is; the three elements of cognizability; what types of evidence may be potentially relevant to the applicant's claim; and how the applicant may prove his or her eligibility for relief. Additionally, we agree with our sister circuits that immigration judges have a duty to explore for, probe into, and elicit all facts relevant to the applicant's claim and potential social groups. *See Agyeman*, 296 F.3d at 877 (stressing that in *pro se* cases "it is critical that the [immigration judge] 'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts'" (quoting *Jacinto*, 208 F.3d at 733)); *Al Khouri*, 362 F.3d

at 464–65 (adopting the same standard); *Mendoza-Garcia*, 918 F.3d at 504 (same)[23]; *see also Matter of S-M-J-*, 21 I. & N. Dec. at 729 (emphasizing immigration adjudicators' shared "duty to ascertain and evaluate all the relevant facts" (quoting United Nations Handbook, para. 196)).

Immigration judges must also seek clarification as needed; help the applicant identify and delineate any potentially cognizable particular social group(s) supported by his or her factual circumstances; and ultimately consider those groups as well as any groups proposed by the applicant in determining eligibility for asylum or withholding of removal. In imposing such a duty, we are hardly breaking new ground, given that immigration judges, the Board of Immigration Appeals, and federal courts alike have long assisted *pro se* asylum seekers with the process of identifying and delineating particular social groups.[24]

---

[23] Notably, our sister circuits imported this "all relevant facts" language from Social Security disability cases. *See, e.g.*, *Jacinto*, 208 F.3d at 733; *Mendoza-Garcia*, 918 F.3d at 504. We too have employed the same standard in the Social Security context for more than four decades. *See, e.g.*, *Marsh*, 632 F.2d at 299 ("[W]hen a claimant appears without the assistance of counsel[,] . . . the [administrative law judge] should 'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'" (citation omitted)).

[24] The amici provide a helpful illustration of immigration judges' duty to develop the record as to a *pro se* asylum seeker's potential particular social groups. The analogy goes as follows:

> Consider the respondent's facts (presented as testimony and in documents) like the tiles in Scrabble, but the respondent does not speak English and cannot spell. The respondent can only use the letters on the tiles, but very well may not know what English words they can spell. Without help, the respondent could never win – and can't even meaningfully participate. The role of the [immigration judge], in this analogy, is to help the respondent determine whether those tiles spell words. The [immigration judge] cannot give the respondent new tiles (in immigration court, supply new facts), but

33

We also find that this requirement is analogous to and consistent with the duty of federal courts to liberally construe *pro se* complaints, "however inartfully pleaded." *Erickson*, 551 U.S. at 94 (quoting *Estelle*, 429 U.S. at 106). This Court has held that district courts must carefully consider any potentially viable legal claims that a *pro se* plaintiff fails to raise, as long as the factual allegations in the complaint could support those claims. *See, e.g.*, *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 540 (4th Cir. 2017); *Williamson v. Stirling*, 912 F.3d 154, 173 (4th Cir. 2018). For example, in *Booker v. South Carolina Department of Corrections*, a *pro se* inmate alleged that prison officials violated his First Amendment rights by retaliating against him for filing grievances. 855 F.3d at 536–37. Because his complaint specifically cited the Free Speech Clause, the district court limited its analysis to the plaintiff's free speech right to submit internal grievances. *Id.* at 540. We held that the district court had erred in failing to consider whether the plaintiff's allegations could also support a claim under the First Amendment's Petition Clause. *Id.* Analogously, in a case involving a *pro se* asylum seeker, the immigration judge has a duty to help articulate and consider any potentially viable particular social groups supported by the record—even if the applicant does not explicitly propose those groups.

---

can ask to see the tiles, and then explain how to form a word from them. DHS can argue with the [immigration judge] about whether the tiles form a word, or whether the word is misspelled, but the [immigration judge] will make the ultimate judgment. The [Board of Immigration Appeals] will review whether the tiles have properly formed a word.

Amicus Br. at 16–17.

E.

Finally, before turning to the specific allegations of error in this case, we must address one additional question: what implications does the aforesaid duty of immigration judges in *pro se* asylum and withholding-of-removal cases have for the Board of Immigration Appeals' 2018 decision in *Matter of W-Y-C- & H-O-B-*? There, the Board of Immigration Appeals held that an applicant for asylum or withholding of removal has the burden to "'clearly indicate' on the record before the Immigration Judge . . . 'the exact delineation of any particular social group(s) to which she claims to belong.'" 27 I. & N. Dec. at 191 (quoting *Matter of A-T-*, 25 I. & N. Dec. 4, 10 (BIA 2009)). Under *W-Y-C-*, any particular social group not explicitly articulated before the immigration judge would generally be forfeited on appeal to the Board of Immigration Appeals.[25] *See id.* at 190–92.

---

[25] Importantly, since its adoption, *W-Y-C-*'s exact-delineation requirement has been strictly applied by both the Board of Immigration Appeals as well as circuit courts. *See, e.g.*, *Del Carmen Amaya-De Sicaran v. Barr*, 979 F.3d 210, 214 (4th Cir. 2020) ("[T]he applicant bears the burden of raising *all* particular social groups and specifying 'the exact delineation of any particular social group(s) to which she claims to belong' on the record before the immigration judge in the first instance." (quoting *Matter of W-Y-C-*, 27 I. & N. Dec. at 191)). Unless the applicant clearly and explicitly states the exact parameters of her particular social group on the record before the immigration judge, the Board of Immigration Appeals will deem that group waived in most cases. *See, e.g.*, *Diaz-Reynoso v. Barr*, 968 F.3d 1070, 1102 (9th Cir. 2020) (Bress, J., concurring in the judgment in part and dissenting in part) ("[The Board of Immigration Appeals'] precedent is clear that the agency must evaluate the proposed social group *exactly as the petitioner has defined it*. . . . On appeal, the [Board] may only consider the specific proposed social group that the petitioner presented to the [immigration judge]." (emphasis added)).

Thus, courts and the Board of Immigration Appeals alike have signaled that under *Matter of W-Y-C-*, it is not enough for the applicant to provide testimony sufficiently indicating what characteristics would make her a target or what particular social group she likely belongs to. *See, e.g.*, *Mendoza-Moran v. Barr*, 819 F. App'x 188, 190 (5th Cir. 2020)

35

In this case, relying on *W-Y-C-*, the Board of Immigration Appeals "decline[d] to consider" the particular social groups of former MS-13 members in El Salvador who left the gang without permission, or family members of José Ramiro, finding that Petitioner "did not advance" these groups before the immigration judge. A.R. 3 & n.2. Petitioner argues that *W-Y-C-*'s "exact delineation" requirement and forfeiture rule should not apply to *pro se* asylum seekers, and thus that the Board of Immigration Appeals' application thereof in his case was error. We agree.[26]

All the aforementioned reasons for obligating immigration judges to assist *pro se* asylum seekers with articulating a particular social group strongly militate against enforcing the exact-delineation requirement and the forfeiture rule against such noncitizens. Requiring *pro se* asylum seekers to "clearly indicate the exact delineation" of their potential particular social groups would be completely inconsistent with immigration judges' robust duty to help such applicants articulate a legally cognizable group. Indeed,

---

(rejecting the petitioner's argument that her testimony was sufficient to raise her proposed social group before the immigration judge and noting that such testimony "does not suffice under *Matter of W-Y-C-*"); *Lopez-Monroy v. U.S. Dep't of Homeland Sec.*, 751 F. App'x 303, 307 (3d Cir. 2018) (rejecting a similar argument). Indeed, in this very case, the Board of Immigration Appeals held that Petitioner "did not meet his burden to articulate before the Immigration Judge" the particular social groups of former MS-13 members in El Salvador who left the gang without permission, or family members of José Ramiro—even though his Form I-589 and testimony clearly indicated that he feared being persecuted on those grounds. A.R. 3 & n.2.

[26] While *W-Y-C-* involved an asylum seeker with counsel, and while the Board of Immigration Appeals has not expressly decided in a precedential opinion whether *W-Y-C-* would apply to uncounseled applicants, the Board has nevertheless strictly enforced the exact-delineation requirement and forfeiture rule in at least some *pro se* cases—as demonstrated by the instant case. *See* A.R. 3. Moreover, the Government too argues that *W-Y-C-* should apply equally in the *pro se* context.

we find it necessary to impose such a duty *precisely because* many, if not most, *pro se* asylum seekers lack the ability to identify or delineate a viable social group. As Judge Dennis on the Fifth Circuit has noted, "[e]ven experienced immigration attorneys have difficulty articulating the contours of a [cognizable social group]. And if this 'exact delineation' requirement is further imposed on *pro se* asylum seekers, they will not stand a chance. Someone who faces persecution on account of a protected ground is no less deserving of asylum's protections because of her inability to exactly delineate a convoluted legal concept." *Cantarero-Lagos*, 924 F.3d at 154 (Dennis, J., concurring). In addition, the exact-delineation requirement runs counter to the United States' obligation under the Refugee Convention (as incorporated into domestic law through the Refugee Act of 1980 and construed by the Board of Immigration Appeals in *Matter of S-M-J-*) to ensure that refugee protection is provided to those whose circumstances warrant it.

The Government asserts that we must accord deference under *Auer v. Robbins*, 519 U.S. 452 (1997), to *Matter of W-Y-C-* because the latter reflected the Board of Immigration Appeals' interpretation of its standard-of-review regulation, 8 C.F.R. § 1003.1(d)(3). However, as noted above—and as the Government concedes—whether *W-Y-C-* is even applicable to *pro se* cases like this one is debatable, since the Board of Immigration Appeals has not decided that question in a precedential decision. But even if *W-Y-C-* is read to apply here, *Auer* deference is inappropriate where an agency's interpretation "violate[s] the Constitution or a federal statute." *Stinson v. Unites States*, 508 U.S. 36, 45 (1993). Because enforcing *W-Y-C-*'s exact-delineation requirement and forfeiture rule against *pro se* asylum

37

seekers would be inconsistent with the dictates of 8 U.S.C. § 1229a(b)(1), we cannot accord any deference here.[27]

Therefore, we hold that *W-Y-C-*'s exact-delineation requirement is inapplicable in *pro se* cases. The sheer complexity of the law relating to particular social groups, the substantial disadvantages faced by *pro se* noncitizens, and the enormity of the interests at stake strongly persuade us that enforcing such a requirement against uncounseled asylum seekers would be both unreasonable and fundamentally unfair.

Relatedly, we hold *W-Y-C-*'s forfeiture rule to be inapplicable to potential particular social groups that went unidentified or unarticulated in immigration court as a result of the immigration judge's failure to fully develop the record as to a *pro se* asylum seeker's claims.[28] If the immigration judge neglects to explore for, probe into, and consider a potentially viable social group fairly supported by the applicant's factual allegations, it would hardly make sense to penalize the applicant—who, as a result of the immigration

---

[27] Again, as explained above, a denial of a statutory protection provided in the Immigration and Nationality Act constitutes a due process violation. *See Rusu*, 296 F.3d at 321 n.7. Thus, for the agency to apply *W-Y-C-* in the *pro se* context would also be inconsistent with the Due Process Clause of the Fifth Amendment.

[28] We need not decide here whether the forfeiture rule may apply where an immigration judge properly discharges his or her duty, but the applicant raises a new particular social group on appeal. As discussed below, the immigration judge in this case clearly did not satisfy her duty. Additionally, we pass no judgment on the general validity of *W-Y-C-*'s exact-delineation requirement and forfeiture rule—i.e., in non-*pro se* cases—as we have no need to address that issue here. That said, we do have concerns about the fairness of strictly enforcing *W-Y-C-* where a particular social group plainly supported by the record goes unarticulated before the immigration judge as a result of counsel's incompetence.

judge's error, is denied a vital statutory protection and deprived of a full and fair hearing—

for the immigration judge's failure to discharge his or her duty.

Accordingly, where the Board of Immigration Appeals finds that an immigration judge failed to probe into and consider a potential social group supported by the applicant's circumstances,[29] it usually must remedy the error by remanding the case for further fact-finding[30] and consideration of that group.[31] *See Matter of E-O-R-A-*, A XXX XXX 056 (BIA Nov. 8, 2018) (remanding for consideration of a potential particular social group supported by the *pro se* applicant's testimony but unaddressed by the immigration judge).

---

[29] Such a group could be raised by the applicant on appeal—presumably with the assistance of counsel or a *pro bono* organization—or discovered by the Board of Immigration Appeals based on its review of the record.

[30] We note that the most recent amendments to 8 C.F.R. § 1003.1(d), which became effective on January 15, 2021, have imposed new limits on the Board of Immigration Appeals' authority to remand a case to the immigration judge for additional fact-finding. *See* 8 C.F.R. § 1003.1(d)(3)(iv), (d)(7)(ii). For example, under the regulation as revised, the Board of Immigration Appeals may not remand a case for additional fact-finding unless the "party seeking remand preserved the issue by presenting it" before the immigration judge and, if that party had the burden of proof, "attempted to adduce the additional facts" before the immigration judge. 8 C.F.R. § 1003.1(d)(3)(iv)(D). However, we are persuaded that these limitations do not apply here.

First, the very agency responsible for promulgating these amendments (the Department of Justice) suggested as much. In the preamble to the final rule setting forth the amendments, the Justice Department explicitly recognized that "immigration judges have an obligation to develop the record" under 8 U.S.C. § 1229a(b)(1), especially in cases involving *pro se* noncitizens. Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 Fed. Reg. 81588, 81597, 81607, 2020 WL 7361179 (Dec. 16, 2020). And as relevant here, the preamble further states that "the [final] rule does not preclude the Board [of Immigration Appeals]" from "order[ing] additional factfinding on remand if it determines an immigration judge erred as a matter of law by not sufficiently developing the factual record for [a noncitizen] proceeding without representation." *Id.* at 81590, 81610. Indeed, that conclusion flows logically from the Department's accurate observation that in cases involving *pro se* respondents, immigration judges' duty to fully develop the record is what "ensure[s] that such [noncitizens] attempt to adduce relevant facts to meet their burdens of proof and reduce[s] the likelihood that [they] inadvertently waive an issue." *Id.* at 81606. Thus, it would hardly make sense if the Board of Immigration

The Government's arguments against imposing the aforesaid duty on immigration judges and holding *W-Y-C-* to be inapplicable in *pro se* cases are without merit. First, the Government emphasizes that it is the applicant, not the immigration judge, who bears the burden of proof to show his or her eligibility for relief, and argues that immigration judges should not take on the role of an advocate. But Petitioner does not dispute that the burden is on applicants like him to prove their eligibility. Nor does he ever suggest that immigration judges should act as advocates.

---

Appeals, despite finding that the immigration judge failed to fully develop the record, were barred from remanding a case due to restrictions *triggered by that very legal error.*

But more fundamentally, the *regulatory* limitations on the Board of Immigration Appeals' authority to remand may not be interpreted and enforced in a manner inconsistent with our *statutory* holding today. *See Stinson*, 508 U.S. at 45 (stating that an agency may not apply its own regulations in a way that violates a federal statute or the Constitution); *see also Rusu*, 296 F.3d at 321 n.7 (denial of statutory protection violates due process). Moreover, if the new restrictions were strictly enforced in a case like this, it would create an absurd situation where the Board of Immigration Appeals finds a prejudicial violation of a *pro se* respondent's statutory rights, but is unable to remedy that critical error by remanding the case—or, for that matter, by engaging in fact-finding itself. *See* 8 C.F.R. § 1003.1(d)(3)(iv)(A) (stating that generally the Board of Immigration Appeals may not "engage in factfinding"). "[W]here a specific duty is assigned by law, and individual rights depend upon the performance of that duty, it seems equally clear that the individual who considers himself injured, has a right to resort to the laws . . . for a remedy." *Marbury v. Madison*, 5 U.S. 137, 166 (1803). In light of these cardinal principles, the Board of Immigration Appeals is not only permitted, but also obligated, to remand the case upon finding that the immigration judge failed to adequately develop the record as to a *pro se* asylum seeker's potential particular social group(s). Such a remand is necessary so that the uncounseled applicant's eligibility for relief can be duly reconsidered in light of those groups, thus protecting the applicant's right to a full and fair hearing.

[31] Of course, the Board of Immigration Appeals may choose not to remand if it determines that consideration of the group is plainly unnecessary for deciding the applicant's eligibility.

Rather, Petitioner argues that *pro se* asylum seekers satisfy their burden when they make a sufficient *factual* showing of their eligibility for relief, and that immigration judges, as immigration law experts, have a duty to flesh out those facts and to help applicants articulate a legally cognizable particular social group based on their factual circumstances.[32] Again, this is hardly different from federal courts' duty to liberally construe *pro se* complaints and to help identify potentially viable legal claims that the plaintiff may not have raised. Moreover, in *Matter of S-M-J-*, the Board of Immigration Appeals found no inconsistency between an asylum seeker's burden of proof and the obligation of immigration judges and the Board of Immigration Appeals to "ensur[e] that refugee protection is provided where such protection is warranted by the circumstances of [the] applicant's claim." 21 I. & N. Dec. at 723. Unsurprisingly, therefore, the Ninth Circuit explicitly rejected a similar argument by the Government in *Agyeman*. *See* 296 F.3d at 884 (emphasizing that obligating immigration judges to fully develop the record "will not transform [them] into attorneys for [noncitizens]"); *see also* Amicus Br. at 4 ("To be clear: we are not asking that [immigration judges] or Board [of Immigration Appeals] members become advocates. Rather, our experience shows that an [immigration judge] can remain a neutral arbiter while still helping the parties develop the record and determine whether existing case law supports a claim for relief."); *Al Khouri*, 362 F.3d at 465 ("[T]he

---

[32] Again, we find the amici's "Scrabble" analogy helpful for understanding this division of roles. *See* Amicus Br. at 16–17.

[immigration judge] did not fulfill his duty to fully develop the record. We do not suggest that the [immigration judge] had a duty to act as [the petitioner]'s advocate or lawyer.").

Equally unavailing is the Government's contention that it would be improper for immigration judges to "take[] over the responsibility for framing the particular social group" and thereby "usurp the applicant's role as [the] master of his or her [claim]." Resp. Br. at 48–49. Of course, in performing their duty to fully develop the record, immigration judges may not disregard any particular social groups *actually proposed* by an applicant. Rather, their duty is to elicit all facts relevant to those groups and *also* to explore for, probe into, help articulate, and consider *other* potentially viable groups supported by the record.

Next, the Government cavalierly suggests that delineating a legally cognizable particular social group should be "nothing difficult or complex for an unrepresented person fleeing persecution" unless the applicant "is trying to construct an *artificial* group to create asylum or withholding eligibility." *Id.* at 50. This view of the matter is utterly divorced from reality. As discussed above, delineating a cognizable social group is an unduly challenging task for many, if not most, *pro se* asylum seekers. Just as troubling—and preposterous—is the Government's claim that "all [noncitizens] would benefit [from] proceeding *pro se*" if immigration judges are obligated to help unrepresented individuals articulate their particular social groups. *Id.* at 52. Such a contention improperly disregards the substantial disadvantages faced by *pro se* asylum seekers. As we have recounted, research shows that *pro se* respondents are *several times* less likely than those with counsel

43

to obtain relief in removal proceedings. Though we hope our holding today will help ease those disadvantages, it surely will not eliminate them.[33]

Finally, the Government suggests that requiring immigration judges to assist *pro se* applicants with delineating a particular social group would produce "grave" costs to "administrative and judicial efficiency." Resp. Br. at 52. That is, by reducing the number of slapdash removal proceedings for uncounseled noncitizens, our holding may add to the already-substantial caseload of immigration judges. But that is a consideration for the elected branches, not for us. We cannot withhold a crucial procedural protection mandated by law merely because enforcing it would be less convenient or less efficient. And at any rate, the robust duty imposed on immigration judges may actually *further* the goal of efficiency, as it will minimize any potential confusion as to an applicant's particular social groups, reduce the number of claims raised for the first time on appeal, and facilitate meaningful review of immigration judges' decisions by the Board of Immigration Appeals—thereby necessitating fewer remands and subsequent appeals.

In conclusion, we hold that immigration judges' duty to fully develop the record entails an obligation to help *pro se* asylum seekers identify and delineate potentially viable particular social groups supported by their factual circumstances. Consistent with this holding, we further conclude that *Matter of W-Y-C-*'s exact-delineation requirement is

---

[33] Moreover, if the Government's argument were to be credited, one would think the demand for representation among Social Security disability claimants—who similarly receive the "benefit" of administrative law judges' duty to develop the record becoming particularly important in *pro se* cases—would be nonexistent. That is, it goes without saying, not the reality.

inapplicable to *pro se* asylum seekers, and that the related forfeiture rule may not be enforced as to potential social groups that went unarticulated as a result of an immigration judge's failure to fulfill the aforesaid duty. With these principles in mind, we now turn to whether the immigration judge and the Board of Immigration Appeals reversibly erred in denying Petitioner's application for withholding of removal.

F.

Petitioner argues that the immigration judge in his case erred in failing to discharge her duty to fully develop the record as to his particular social groups. We agree.

During his removal proceedings, Petitioner unambiguously articulated the factual bases for the relief he requested. On his Form I-589, he checked off the appropriate box to indicate that he was seeking asylum and withholding of removal based on membership in a particular social group. On the form, Petitioner explained that he feared return to El Salvador because he believed MS-13 would kill him for leaving the gang. He further stated that he had previously received death threats from the gang; that MS-13 would find and kill anyone who deserted the gang; and that MS-13 members had murdered his cousin for trying to leave them. Petitioner concluded: "That's why I came to [the] USA. I don't want to be part of gangster but I'm afraid to [go] back [because of] them." A.R. 347.

During his testimony before the immigration judge, Petitioner again expressed his fear that MS-13 would kill him upon his return to El Salvador because he had left the gang without permission. *See supra*, Part I.B. Moreover, he connected his fear to the murder of his cousin, José Ramiro. When the immigration judge asked Petitioner why he believed MS-13 would kill him, he explained that the gang had already threatened him along "*with*

45

*[his] cousin*," and that MS-13 later murdered Ramiro for leaving the gang. A.R. 175–76 (emphasis added).

All of this clearly indicated the factual bases undergirding Petitioner's potential social groups for his withholding claim: his status as a former MS-13 member who left the gang without permission[34] and his familial relationship to his cousin who was threatened alongside Petitioner and later killed by the gang. Thus, we find that Petitioner alleged sufficient facts relevant to his eligibility for relief during his removal proceedings to put the immigration judge on notice as to his potential social groups. Given that Petitioner was a detained, *pro se* applicant with only a high school education, limited English skills, and no legal training, we simply do not see what more we could ask of him.

On the other hand, the immigration judge fell far short of her legal duty to fully develop the record. At no point during Petitioner's hearing did the immigration judge probe into or attempt to clarify his particular social groups. Nor did the immigration judge make

---

[34] The Government inexplicably dedicates a substantial portion of its brief to arguing that Petitioner's testimony suggested his particular social group consisted of *current* gang members. In making that argument, the Government improperly mischaracterizes Petitioner's testimony. For instance, the Government's brief notes that during his individual hearing, Petitioner responded "No" when asked "Now in terms of when you were still in El Salvador, you never actually left the gang?" Resp. Br. at 37; A.R. 183. But the transcript of the hearing actually shows that the full question posed to Petitioner was "Now in terms of when you were still in El Salvador, you never actually left the gang? *Is that correct?*" A.R. 183 (emphasis added). The Government's omission of "Is that correct?" plainly mischaracterizes the meaning of Petitioner's response of "No." In fact, despite the Department of Homeland Security attorney's persistent efforts during the hearing to get Petitioner to admit that he was still part of the gang, Petitioner consistently denied his MS-13 membership. *See, e.g.*, A.R. 183–84 (showing Petitioner responding, "No. I left."; and "No. I'm nothing [not a member].").

any effort to help Petitioner understand what a particular social group is or what elements must be proven. In fact, the immigration judge never once mentioned the phrase "particular social group" during the hearing, let alone asked Petitioner to articulate his social group.

Further, we conclude that the immigration judge's questioning was deficient. She neglected to ask obviously relevant and important questions, such as:

- What acts would be considered "leaving the gang"?

- Could a MS-13 member ever be permitted to leave the gang?

- What attributes or factors would distinguish a current gang member from a former one? How would a former member be identified?

- If a MS-13 member suddenly left the country and cut off communications with the gang, would he be perceived as a deserter?

- Other than your cousin, do you know any other gang members who tried to leave or left the gang? Anyone who fled to the U.S.? What happened to them?

- What exactly did your cousin tell the gang before he was murdered?

- Does the gang know that you and your cousin are related?

- Has MS-13 threatened anyone in your family since you came to the U.S.?

Therefore, we simply cannot conclude that the immigration judge "scrupulously and conscientiously probe[d] into, inquire[d] of, and explore[d] for all the relevant facts.'" [35]
*Agyeman*, 296 F.3d at 877 (quoting *Jacinto*, 208 F.3d at 733).

---

[35] It is possible that the immigration judge deemed it unnecessary to probe and inquire further because she did not believe Petitioner's testimony that he had left MS-13 and thus

Furthermore, the immigration judge failed to include any discussion of particular social groups in her written decision, other than a passing remark in a footnote stating that "[n]o cognizable social group . . . cover[ed]" being "threatened while still a gang member for indicating [a desire] to leave." A.R. 136. In short, the immigration judge denied Petitioner's application for relief and ordered him removed without ever exploring or considering the potential particular social groups of former MS-13 members in El Salvador who left the gang without permission, or family members of José Ramiro—even though Petitioner's testimony provided more than sufficient notice that his claim could be based on either of these groups.

Thus, we conclude that the immigration judge plainly failed to fulfill her duty to fully develop the record as to Petitioner's particular social groups. This failure violated Petitioner's statutory right under 8 U.S.C. § 1229a(b)(1), and it would constitute a reversible error if it prejudiced him. *See Rusu*, 296 F.3d at 320.

would be persecuted as a former gang member. But that would be no less erroneous. Except where a noncitizen's testimony lacks credibility beyond any doubt, an immigration judge's skepticism or incredulity does not relieve him or her of the duty to fully develop the record. Such a view puts the cart before the horse because under the Immigration and Nationality Act and Fourth Circuit precedent, an immigration judge's credibility determination "must take into account *all the evidence submitted*," and must be based on "*the totality of the circumstances*" and supported "by *the record as a whole*." *Ilunga v. Holder*, 777 F.3d 199, 206–07 (4th Cir. 2015) (emphases added) (citing 8 U.S.C. § 1158(b)(1)(B)(iii)). Thus, it would be *doubly erroneous* for an immigration judge to disregard his or her duty to develop the record based on a prejudged conclusion as to the respondent's credibility: first, the immigration judge would err by making a credibility determination before the record is even closed; and second, by neglecting the duty to develop the record based on such an improper credibility determination.

Such a violation causes prejudice if it is "likely to impact the results of the proceedings." *Rusu*, 296 F.3d at 320–21 (quoting *Jacinto*, 208 F.3d at 728). By its very nature, however, an immigration judge's failure to fully develop the record regarding an issue material to the respondent's removability or eligibility for relief is not an error amenable to the ordinary prejudice inquiry. Such a failure often makes it difficult for a reviewing court to determine whether any prejudice resulted from that very error— *precisely because the record has not been adequately developed as to the material issue.* In those situations, it would hardly be fair to rule against the noncitizen for failing to make a sufficient showing of prejudice. Accordingly, we hold that an immigration judge's failure to satisfy his or her duty to fully develop the record is *presumptively prejudicial*, unless the error is plainly irrelevant to, or otherwise does not hinder in any way, the reviewing court's ability to assess whether prejudice occurred.

Again, this approach is in line with that of at least some of our sister circuits.[36] In *Agyeman*, the Ninth Circuit emphasized that "prejudice may be shown where the [immigration judge's] inadequate explanation of the hearing procedures and failure to elicit pertinent facts prevented the [noncitizen] from presenting evidence relevant to their claim." 296 F.3d at 884–85 (citing *Jacinto*, 208 F.3d at 734–35). The court further explained that prejudice may be "*infer[red]* . . . in the absence of any specific allegation as to what evidence . . . would have [been] presented" had the immigration judge adequately

---

[36] Not all circuits have adopted this approach. For instance, in *Mendoza-Garcia*, the Sixth Circuit held that the petitioner's "challenge necessarily fail[ed]" for lack of a showing that his "claims could have supported a different outcome." 918 F.3d at 509.

developed the record, and that the petitioner should "not [be] require[d] . . . to 'produce a record that does not exist.'" *Id.* at 885 (emphasis added) (quoting *Perez-Lastor v. INS*, 208 F.3d 773, 782 (9th Cir. 2000)). Based on these principles, the Ninth Circuit concluded that "[h]ad the [immigration judge] provided an adequate explanation or sufficiently developed the record, [the petitioner] may have provided sufficient evidence to support his application for adjustment of status." *Id.*

The Eighth Circuit took a similar approach in *Al Khouri*. There, the court explained that it could not determine whether the asylum-seeking petitioner would have been granted relief had the immigration judge sufficiently developed the record, because "the fundamental error in [the petitioner's] hearing prevented him from fully developing the merits of his case." *Al Khouri*, 362 F.3d at 466. Relying on *Agyeman* and emphasizing that the petitioner could not "produce a record that d[id] not exist," the Eighth Circuit held that "the [immigration judge's] failure to inquire into all the pertinent details of [the petitioner's] application" may well have prejudiced him. *Id.* at 467.

In presuming prejudice from the immigration judge's failure to fully develop the record, we draw additional support from *Doggett v. United States*, 505 U.S. 647 (1992). In *Doggett*, the Supreme Court held that unreasonable delay between a criminal defendant's indictment and his trial is "presumptively prejudicial" and may violate his Sixth Amendment right to a speedy trial, depending on other factors. 505 U.S. at 652–56. While recognizing that *Doggett* was a criminal case involving a different type of claim, we find it analogous to the instant case in a critical aspect. In *Doggett*, the Supreme Court found it necessary to presume prejudice because excessive delay "compromises the reliability of a

50

trial in ways that neither party can prove or, for that matter, identify." *Id.* at 655. Likewise, we believe an immigration judge's failure to fully develop the record should be deemed presumptively prejudicial since that very error is likely to hamper the ability of the reviewing court to assess whether and how the applicant was prejudiced.

Applying the presumed-prejudice rule here, we are compelled to vacate the denial of Petitioner's application for withholding of removal. As discussed above, the immigration judge hardly developed the record as to whether Petitioner's life or freedom would be threatened in El Salvador on account of his membership in particular social groups consisting of former MS-13 members in El Salvador who left the gang without permission, family members of José Ramiro, or both. Nor did the immigration judge make any factual inquiries necessary for determining whether either of those potential groups would satisfy the immutability, particularity, and social-distinction requirements and thus be legally cognizable. *See Matter of M-E-V-G-*, 26 I. & N. Dec. at 237. Thus, we find that the immigration judge's failure to develop the record has limited our ability to meaningfully review and determine as a matter of law whether that error was "likely to impact the results" as to Petitioner's application for withholding of removal. *Rusu*, 296 F.3d at 320 (quoting *Jacinto*, 208 F.3d at 728). Presuming prejudice, we conclude that the immigration judge's error requires this Court to vacate the denial of Petitioner's withholding-of-removal application.

Additionally, to the extent that the immigration judge suggested Petitioner's withholding claim was based on a potential particular social group consisting of *current* gang members—when she wrote that being "threatened while still a gang member for

51

indicating he wanted to leave" would not constitute a protected ground—we hold that this, too, was error. This Court has held that immigration judges may not distort important aspects of an applicant's claim. *See Tassi*, 660 F.3d at 719; *see also Alvarez Lagos v. Barr*, 927 F.3d 236, 253 (4th Cir. 2019) (holding that mischaracterizing an applicant's proposed social group is a "critical legal error[]"). Again, Petitioner's Form I-589 and in-court testimony unambiguously indicated that his asylum and withholding claims were based primarily on his status as a *former* MS-13 member who left the gang without permission. Petitioner never alleged at any point that he would face persecution in El Salvador because he was a *current* gang member who had been threatened for indicating a desire to leave the gang. Because the immigration judge's mischaracterization of Petitioner's claim was an "error[] of law [that] necessarily constitute[d] an abuse of discretion," *Tassi*, 660 F.3d at 725, it provides an additional ground for vacating her decision.[37]

"For its part, the [Board of Immigration Appeals] erred in failing to recognize the [immigration judge's] [legal] errors," which necessarily renders the Board's decision "manifestly contrary to law and an abuse of discretion." *Id.* Here, both the immigration judge's failure to fully develop the record and her mischaracterization of Petitioner's claim went unrecognized by the Board of Immigration Appeals. If anything, the Board of Immigration Appeals only compounded the latter error. In affirming the denial of

---

[37] Indeed, the Government acknowledges that "the applicant is the master of his or her claim" and that immigration judges may not "substitute their view of the relevant [particular social] group for the group the applicant has chosen." Resp. Br. at 47. By mischaracterizing Petitioner's claim, the immigration judge impermissibly infringed upon his "right to control his . . . claim." *Id.*

Petitioner's application for withholding of removal, the Board of Immigration Appeals held that Petitioner was not eligible for relief on the basis of his membership in a particular social group consisting of "current gang members who are threatened for wanting to leave the gang." A.R. 3. Again, Petitioner never testified that he feared persecution on such a basis, and distorting important aspects of an applicant's claim is a reversible legal error. *See Tassi*, 660 F.3d at 725; *Alvarez Lagos*, 927 F.3d at 253.

Moreover, the Board of Immigration Appeals further erred in relying on *Matter of W-Y-C-* to preclude any consideration of whether Petitioner's life or freedom would be threatened on account of his membership in either former MS-13 members in El Salvador who left the gang without permission or family members of José Ramiro. *See* A.R. 3 (Board of Immigration Appeals holding that "it is unnecessary to determine whether" these groups constitute "cognizable particular social group[s] because [Petitioner] did not advance [them] before the Immigration Judge."). As we held above, *W-Y-C-*'s exact-delineation requirement is inapplicable to *pro se* asylum seekers, and the forfeiture rule may not be enforced in *pro se* cases where a potential particular social group supported by the applicant's factual circumstances goes unarticulated in immigration court as a result of the immigration judge's failure to fully develop the record. And for the same reason, the Board of Immigration Appeals also erred in holding that "to the extent that [Petitioner] claim[ed] . . . due process violations, he [could not] establish" prejudice since he "did not articulate a valid particular social group . . . before the Immigration Judge." A.R. 4.

Because we conclude that both the immigration judge and the Board of Immigration Appeals reversibly erred below, we grant Arevalo Quintero's petition as to his withholding-

53

of-removal claim. Accordingly, we vacate his final order of removal and remand for further fact-finding and reconsideration of his withholding application in light of this decision.[38]

## IV.

Petitioner also argues that the immigration judge's denial of his Convention Against Torture claim and the Board of Immigration Appeals' affirmance thereof were based on legal errors. Specifically, he contends that (1) the Board of Immigration Appeals erred in failing to consider and aggregate the risk of torture from different sources; and (2) neither the immigration judge nor the Board of Immigration Appeals duly considered all of the record evidence relevant to whether the Salvadoran government would consent to or acquiescence in torture. Our decision in *Rodriguez-Arias v. Whitaker*, 915 F.3d 968 (4th Cir. 2019), compels us to agree with Petitioner on both points.

---

[38] The Government argues that a remand would be futile because the Board of Immigration Appeals' earlier decision in this case already considered the particular social group consisting of former MS-13 members in El Salvador who left the gang without permission and held that such a group was not cognizable because it lacked particularity. However, the Board of Immigration Appeals' subsequent decision—the one we review here— effectively vacated that portion of its earlier decision by substantively altering the rationale for denying Petitioner's withholding-of-removal claim. In fact, the Board of Immigration Appeals explicitly withdrew from its prior holding by stating: "*[U]nlike our prior decision*, we now conclude that *it is unnecessary to determine* whether [former MS-13 members in El Salvador who left the gang without permission] . . . constitutes a cognizable particular social group [in light of *Matter of W-Y-C-*]." A.R. 3 (emphases added). Therefore, the Board of Immigration Appeals' earlier cognizability determination lacks legal force. *See Thomas v. Att'y Gen. of U.S.*, 625 F.3d 134, 140–41 (3d Cir. 2010) (noting that the Board of Immigration Appeals' subsequent decision "operate[s] to vacate [its] earlier decision" if the former "substantively alter[s] the *ratio decidendi* in" the latter). But more importantly, that determination would be legally erroneous at any rate, in light of our recent decision that "the proposed [social group] of 'former Salvadoran MS-13 members'" satisfied the particularity requirement. *Amaya*, 986 F.3d at 438.

To qualify for Convention Against Torture protection, a noncitizen must show that it is more likely than not that he or she would be tortured in the country of removal. 8 C.F.R. § 1208.16(c)(2). Torture is defined as (1) "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person" (2) "by, or at the instigation of, or with the consent or acquiescence of, a public official . . . or other person acting in an official capacity." *Id.* § 1208.18(a)(1). "Public officials acquiesce to torture when, 'prior to the activity constituting torture, [they] have awareness of such activity and thereafter breach [their] legal responsibility to intervene to prevent such activity.'" *Rodriguez-Arias*, 915 F.3d at 971 (quoting 8 C.F.R. § 1208.18(a)(7)). Importantly, acquiescence does not require actual knowledge of torture. *Id.*

A.

As to Petitioner's first argument, we agree that the Board of Immigration Appeals impermissibly failed to aggregate his risk of torture from all the different sources alleged, thereby flouting the rule we set forth in *Rodriguez-Arias*. Notably, the Board of Immigration Appeals' earlier decision in this case examined only Petitioner's risk of being tortured at the hands of MS-13. But shortly after that decision, we decided *Rodriguez-Arias*. In that case, we held that when a Convention Against Torture applicant faces a risk of torture from more than one source, "the risk . . . from all sources should be combined when determining whether [the applicant] is more likely than not to be tortured." *Id.* at 973. Accordingly, on remand, Petitioner argued to the Board of Immigration Appeals that he faced a risk of torture from MS-13, rival gangs, law enforcement, and vigilante death squads, and that *Rodriguez-Arias* required the Board to aggregate the risk of torture from

all of these sources in assessing the likelihood that he would be tortured. But in its subsequent decision, the Board of Immigration Appeals inexplicably failed to even mention or discuss, let alone aggregate, the risk of torture from the different sources alleged. Instead, it simply adopted the reasoning in its prior opinion—based only on the risk of torture from MS-13—without providing *any* additional analysis. This was a clear legal error necessitating remand. *See Rodriguez-Arias*, 915 F.3d at 973.

The Government's arguments to the contrary are unavailing. The Government contends that the Board of Immigration Appeals did not need to aggregate the risk of torture in this case because Petitioner, unlike Rodriguez-Arias, never testified before the immigration judge that he feared being tortured at the hands of the police or vigilante groups. But regardless of what Petitioner said or did not say in his testimony, the Board of Immigration Appeals still had a legal duty to consider and aggregate the risk of torture from the different sources. In assessing the likelihood of torture, the Board of Immigration Appeals must consider "*all evidence* relevant to the possibility of future torture." 8 C.F.R. § 1208.16(c)(3) (emphasis added). Also importantly, applicants for Convention Against Torture relief are not required to demonstrate a subjective fear of torture. *Lin*, 517 F.3d at 696. Under these principles, as long as Petitioner "provide[d] independent evidence demonstrating that it is more likely than not that he would be tortured," the lack of testimony is not dispositive. *Lin v. Holder*, 611 F.3d 228, 236–37 (4th Cir. 2010).

Here, the record contains ample evidence showing that former MS-13 members in El Salvador commonly face the risk of being tortured or killed by MS-13, rival gang members, law enforcement, or vigilante death squads. Thus, the Board of Immigration

Appeals should have taken all of the different potential torturers into account in assessing Petitioner's Convention Against Torture claim.

B.

Additionally, we agree with Petitioner that the immigration judge and the Board of Immigration Appeals both erred in failing to properly consider his country-conditions evidence relating to the Salvadoran government's consent to or acquiescence in torture.

Again, *Rodriguez-Arias* is squarely applicable here. In that case, we held that the Board of Immigration Appeals and the immigration judge erred in "failing to meaningfully engage with" extensive documentary evidence regarding the risk of torture. *Rodriguez-Arias*, 915 F.3d at 974. We explained: "It is an abuse of discretion for the Board [of Immigration Appeals] or [immigration judge] to arbitrarily ignore relevant evidence. . . . 'Those who flee persecution and seek refuge under our laws have the right to know that the evidence they present of mistreatment in their home country will be fairly considered and weighed by those who decide their fate.'" *Id.* (quoting *Baharon v. Holder*, 588 F.3d 228, 233 (4th Cir. 2009)). We further noted that "the Board [of Immigration Appeals'] or [immigration judge's] failure to engage with an applicant's evidence hampers [our] ability to meaningfully review what was decided below." *Id.*

Based on these principles, we held that the immigration judge "did not meaningfully address" the country-conditions evidence concerning the Salvadoran government's participation in and acquiescence to torture of gang members. *Id.* Even though the immigration judge did acknowledge that there were "some instances of torture of gang members and former gang members by the police" as well as evidence that "Salvadoran

authorities ha[d] recently failed to address many instances of vigilante violence," we found such cursory acknowledgements to be wholly insufficient. *Id.* Likewise, we concluded that the Board of Immigration Appeals too failed to duly consider the evidence in the record relating to the Salvadoran government's consent to or acquiescence in torture of gang members. *Id.*

Here too, both the immigration judge and the Board of Immigration Appeals failed to meaningfully engage with the extensive country-conditions evidence submitted by Petitioner, which spanned nearly a hundred pages. Notably, the record contains substantial evidence indicating that for many years, the Salvadoran government has not only acquiesced in acts of torture committed by non-state actors—such as gangs and vigilante groups—against current and former gang members, but also actively encouraged or committed torture itself.

But neither the immigration judge nor the Board of Immigration Appeals properly considered such evidence in denying Petitioner's Convention Against Torture claim. Instead, the immigration judge's decision merely stated in a conclusory manner and without a *single* citation to the record that "[c]ountry condition information indicates that the government of El Salvador is taking steps to address the challenging problems presented by gang violence and instances of official corruption there." A.R. 137. Based on this finding, the immigration judge concluded that Petitioner had failed to meet his burden of showing that he would more likely than not suffer torture in El Salvador. The Board of Immigration Appeals simply affirmed this portion of the immigration judge's decision without further analysis. "This wholesale failure to fully consider [Petitioner]'s country-

conditions evidence constitutes reversible error." *Rodriguez-Arias*, 915 F.3d at 975. Because "country conditions alone can play a decisive role in granting [Convention Against Torture] relief," *id.* (quoting *Kamalthas v. INS*, 251 F.3d 1279, 1280 (9th Cir. 2001)), this error compels us to vacate and remand.

As a final note, we reject the Government's suggestion that the denial of Petitioner's Convention Against Torture claim should be affirmed because he has failed to meet his burden of showing that he would more likely than not be tortured in El Salvador. According to the Government, the fact that Petitioner was not previously tortured "negates" his Convention Against Torture eligibility. Resp. Br. at 54. But that is plainly incorrect. Although evidence of past torture may be a relevant factor in Convention Against Torture analysis, its absence is far from dispositive. "[Convention Against Torture] relief *lacks a subjective element* . . . and requires a showing with respect to *future, rather than past treatment.*" *Lin*, 517 F.3d at 696 (emphases added). Accordingly, in assessing the objective risk of future torture, immigration judges must also consider various other factors including current country conditions and the possibility of internal relocation. *See Suarez-Valenzuela v. Holder*, 714 F.3d 241, 245 (4th Cir. 2013). Thus, even if Petitioner has not suffered past torture, that by no means constitutes a sufficient basis for denying his Convention Against Torture claim. Moreover, given the country-conditions evidence in the record showing the significant risk of torture faced by former and current gang members in El Salvador, we simply cannot conclude as a matter of law that Petitioner has failed to meet his burden.

For the foregoing reasons, we vacate the denial of Petitioner's application for Convention Against Torture relief and remand for further proceedings consistent with this opinion and *Rodriguez-Arias.*

V.

In our country, few populations are as vulnerable as noncitizens facing removal proceedings who are unable to secure the assistance of adequate counsel. Yet the consequences they may face are severe: family separation, prolonged detention, and deportation to a country where persecution or even death awaits.

We are acutely conscious of the harsh realities of our immigration system faced by thousands of noncitizens each day. These individuals come to our shores in search of sanctuary and a better life. Many are poor, young, uneducated, or (like Petitioner) all three. Of course, we recognize that immigration policies are primarily a concern for the elected branches. But it is our role, and our highest duty, to ensure that those policies are applied fairly and with full regard to our laws and our Constitution.

With these grave concerns in mind, we hold today that under the Immigration and Nationality Act and, where relevant, the United States' obligations under the Refugee Convention, immigration judges have a legal duty to fully develop the record, which becomes particularly important in *pro se* cases. We believe this procedural protection is essential for ensuring fundamental fairness and reasoned decisionmaking in removal proceedings.

Based on our review of the record, we conclude that the immigration judge below failed to fulfill her duty to fully develop the record, thereby depriving Petitioner of a vital

60

statutory protection and a full and fair hearing. In light of this and other errors made by the immigration judge and the Board of Immigration Appeals, we grant the petition, vacate Petitioner's final order of removal, and remand to the Board of Immigration Appeals with instructions to remand the case to the immigration judge for further fact-finding and reconsideration of Petitioner's application for withholding of removal and Convention Against Torture relief.

*PETITION FOR REVIEW GRANTED AND*
*REMAND AWARDED*

DIANA GRIBBON MOTZ, concurring in the judgment:

I concur in the panel's holdings that: (1) Immigration Judges are statutorily bound to fully develop the record during immigration proceedings; (2) this duty is especially important in *pro se* cases; and (3) this duty extends to proceedings, like the one at issue in this case, in which noncitizens articulate a proposed social group.